**McKEAN PUBLIC SEWER ASSOCIATION,**
Petitioner,

v.

**PENNSYLVANIA INFRASTRUCTURE INVESTMENT AUTHORITY,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 12, 2002.

Decided March 21, 2002.

Reargument Denied May 15, 2002.

**380**

Matthew L. Wolford, Erie, for petitioner.

Andrew H. Cline, Harrisburg, for respondent.

Joseph W. Tinko, Meadville, for intervenor.

Before FRIEDMAN, Judge, LEADBETTER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

The McKean Public Sewer Association (Association) petitions for review of the July 18, 2001 decision of the Pennsylvania Infrastructure Investment Authority (Pennvest), which approved funding for a portion of .the McKean Township Sewer Authority's (Authority) wastewater construction project (Project). We quash the Association's petition for review.

The Authority planned to construct a sanitary sewer collection and treatment system at an estimated cost of $6,534,000, hoping to eliminate sources of water pollution and allow for needed residential, commercial and industrial growth in User District I in McKean Township (Township). (R.R. at 1, 4–6.) Under the proposed Project plan, the sewer lines were to extend in two directions from the wastewater treatment plant. One line was to run north along Sterrettania Road toward the Interstate 90 (I–90) interchange; the other line was to run east along West Road toward the Interstate 79 (I–79) interchange. (R.R. at 18, 21.) The Authority received approval of the Project plan from the Department of Environmental Protection (DEP) and applied to Pennvest for low-interest construction funding for the Project.

The Association is comprised of Township residents who oppose the Project. (See S.R. at 28b.) The Association sent a letter to Pennvest, dated February 21, 2001, urging that Pennvest deny the Township's application for funding and providing various reasons for this request. (R.R. at 28–35.) In light of the Association's concerns, as well as doubts raised about the scope of the Project from other sources, Pennvest sent the Authority a letter, dated March 6, 2001, asking the Authority to respond to the issues raised. (R.R. at 41–42.) The Authority did so in a letter dated March 19, 2001. (R.R. at 43–56.) The Authority's application for funding then was placed on the agenda of Pennvest's March 21, 2001 quarterly Board meeting.

At the Board meeting, Pennvest recommended that the Board defer action on the Project to allow time to resolve remaining concerns about the preservation of agricultural land along the West Road and I–79

interchange portion of the Project.[1] (R.R. at 65–68.) The Board discussed the matter and allowed two five-minute presentations; Mr. Clay Fails, of Hill Engineering, Inc., spoke in favor of the Project, (R.R. at 69–70), and Mr. Matt Wolford, counsel for the Association, spoke for the Association in opposition to the Project. (R.R. at 70–71.) Ultimately, the Board voted unanimously to defer the matter until its July 18, 2001 meeting. (R.R. at 72.)

In the interim, the Governor's Center for Local Government Services invited the Association to attend an interagency meeting on April 9, 2001 to discuss concerns about the Authority's proposed Project. (R.R. at 78.) On that date, Pennvest's Deputy Executive Director, Brion T. Johnson (Johnson), met with the Authority and other represented agencies, and he met separately with the Association. (R.R. at 115.)

In response to a request from Johnson, the Authority submitted an engineering report to Pennvest on May 2, 2001, evaluating the costs for several alternatives to the Township sewer Project as currently designed. (R.R. at 80–85.) By letter dated July 6, 2001, Johnson informed the Authority that an engineering consulting firm reviewed the May 2, 2001 report and identified some problems with the Project. Johnson also informed the Authority that,

after discussion with DEP and the Department of Community and Economic Development, Pennvest would recommend funding only for the documented needs area of the Project, which included the area from the I-90 interchange down to the proposed plant site. The balance of the Project, including the West Road and I-79 interchange areas, which involved agricultural land, would not be eligible for Pennvest funding. Johnson then asked the Authority to review the cost estimate prepared by the consultant. (R.R. at 86–88.) Johnson followed with a letter of clarification on July 9, 2001. (R.R. at 89.)

On July 12, 2001, the Association obtained copies of the July 6 and 9 letters from Pennvest. On July 16, 2001, the Association prepared a comment letter and submitted it to Pennvest by fax and overnight mail. In the letter, the Association voiced its continued objection to the Project—including the scaled down version proposed by Pennvest in its July 6, 2001 letter—and expressed its view that a decision by Pennvest to fund the altered version of the Project at the July Board meeting would undermine DEP's authority to approve Project revisions and would deprive the Association of its procedural due process rights. (R.R. at 90–97.) The Association also retained an attorney, who appeared at the July 18, 2001 Board meet-

---

1. The concerns were raised by the Erie County Agricultural Land Preservation Board in a January 13, 2001 letter. In the letter, the Erie County Agricultural Land Preservation Board responded to Pennvest's request for comments with regard to land use policies and their impact on the proposed Project prior to Pennvest's ruling on the Authority's application for funding. (R.R. at 22–24.)

This was not the first time the Authority applied for funding for this Project. In fact, Pennvest had considered, and approved, funding for the Project in 1997. However, the Authority chose to turn down the original approval and reapply in the hope that it could

take advantage of new legislation that made more grant money available for such projects than previously had been the case. Pennvest treated the Authority's second application as a completely new application, thereby making it subject to land use legislation that had been passed in the interim. For this reason, Pennvest recommended deferring consideration of the Authority's application to afford additional time to resolve differences between the Project as proposed and the land use concerns expressed by the Erie County Agricultural Land Preservation Board. (R.R. at 66–67.)

ing, addressed the Board with these concerns and provided copies of the Association's comment letter to the Board. (R.R. at 114–19.) After discussing the matter at the July 18, 2001 meeting, the Board approved funding for the I–90 portion of the Authority's sewer Project for the Township. (R.R. at 122.) On July 27, 2001, Pennvest sent the Authority a commitment letter, formalizing its offer to make a loan and a grant to the Authority in order to finance this portion of the Project.[2] (R.R. at 133–39.)

The Association filed a petition for review with this court on August 18, 2001, and the Township and Authority intervened. On January 8, 2002, the Association filed an application for stay, which this court denied on January 30, 2002.[3]

■ On appeal, the Association argues that, in rendering the challenged decision, (a) Pennvest failed to comply with the procedures required under Chapter 5, Subchapter A of the Administrative Agency Law, 2 Pa.C.S. §§ 501–508,[4] and (b) Pennvest violated the Association's constitutional due process rights. On the other hand, Pennvest contends that its decision to approve funding for the Authority's Project does not constitute an "adjudication" with respect to the Association and its

members and, further, that the Association lacks standing to challenge Pennvest's decision. Thus, Pennvest asserts that the Association lacks procedural and appeal rights under the Administrative Agency Law. Because we agree with Pennvest that the Association lacks standing to appeal, we dismiss its petition to review on that basis.

Subsection 10(c) of the Act of March 1, 1988 (Pennvest Act), P.L. 82, *as amended*, 35 P.S. 751.10(c), contains express provisions relating to the appealability of Pennvest decisions on an application for financial assistance. That subsection provides that:

> Establishment of priority for financial assistance under subsection (b) or (d) shall not be deemed to be a final action under 2 Pa.C.S. (relating to administrative law and procedure), nor shall it confer a right or duty upon the board or any other person. A decision as to an applicant's eligibility under subsection (a) may be appealed pursuant to 2 Pa. C.S., but the priority assigned the project may not be raised in that appeal.

35 P.S. § 751.10(c). We agree with the Association that, through this language, the legislature plainly intended that a Pennvest decision regarding an applicant's

---

**2.** On August 27, 2001, the Authority and the Township signed an acceptance, agreeing to the terms and conditions of the offer. (R.R. at 140–47.)

**3.** On November 5, 2001, this court granted, in part, a motion filed by the Association and directed Pennvest to supplement the record with the minutes from Pennvest's July 18, 2001 Board meeting.

**4.** Under the provisions of the Administrative Agency Law, an administrative agency must afford a party various procedural protections before an adjudication affecting the party's legally protected rights can be validly issued. For example, a party must be afforded reasonable notice of a hearing and an opportuni-

ty to be heard. 2 Pa.C.S. § 504. All testimony must be stenographically recorded and a complete record kept of the proceedings. *Id.* The opportunity for reasonable examination and cross-examination must be permitted. 2 Pa.C.S. § 505. Parties must have the opportunity to submit briefs prior to an adjudication. 2 Pa.C.S. § 506. Adjudications must be in writing and must contain findings and reasons for the adjudication. 2 Pa.C.S. § 507. The Association maintains that, because these procedural requirements were not followed, Pennvest's decision must be vacated and the matter remanded for a hearing that comports with the Administrative Agency Law.

eligibility for funding, that is, whether the applicant has satisfied the criteria set forth in subsection 10(a) of the Pennvest Act, 35 P.S. § 751.10(a), constitutes an appealable adjudication under the Administrative Agency Law. However, merely because Pennvest has issued an appealable adjudication does not mean that any person has standing to appeal that adjudication before this court.

■ Section 702 of the Administrative Agency Law provides that "[a]ny person *aggrieved* by an adjudication of a Commonwealth agency *who has a direct interest* in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals." .... 2 Pa.C.S. § 702 (emphasis added). A person has a "direct interest" in an adjudication if he or she is able to show that the adjudication caused harm to his or her interest or, alternatively, that the purported harm resulted in some way from the adjudication. Only if thus "aggrieved" would such person have standing to obtain a judicial resolution of his or her challenge. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975); *Venango Newspapers v. Unemployment Compensation Board of Review,* 158 Pa.Cmwlth. 379, 631 A.2d 1384 (1993).

■ Here, the subject matter of the proceeding before the Pennvest Board was possible Pennvest funding for the Township's sewer Project. The Association argues that it has a direct interest in this matter because, if Pennvest provides low-interest funding for the Project, then the members of the Association, as taxpayers and sewer users, will have to repay the loan. (Association's brief at 30.) In other words, the Association assumes that, if Pennvest does not fund the Project, the Authority will not proceed with the Project, and the Association members will be spared the increased costs that the Project allegedly will impose on them. However, the Association's argument is based on speculation. In fact, it does not appear that Pennvest's grant of funding for the sewer Project will necessarily harm, and may even benefit, the Association's members. The Authority may well try to obtain alternate financing for the Project, at interest rates higher than that charged by Pennvest. In that case, the Association's members will have larger loans to repay. Because the damage claimed by members of the Association here is speculative and has not yet occurred, they have no standing to maintain this appeal.[5]

5. Intervenors here make the argument that, even if the Association were a party with standing to appeal, thereby requiring this court to consider the Association's due process argument, the Association could not obtain the relief it seeks. We agree. According to the Association, its members, who are local taxpayers opposed to the underlying Project, are entitled to the procedural protections afforded by the Administrative Agency Law before Pennvest could decide the Association's request to deny Project funding by granting the Authority's application. Contrary to the Association's claim, the Association received all of the due process protections to which it was entitled.

When there are no specific provisions in a statute regarding the adjudicatory actions of an agency, the Administrative Agency Law provides a default mechanism for the provision of hearings and for appeals from administrative adjudications which comport with due process requirements. *See* 2 Pa.C.S. § 106; *Turner v. Pennsylvania Public Utility Commission,* 683 A.2d 942 (Pa.Cmwlth.1996). Here, however, there is a specific statutory provision giving Pennvest the power to adopt regulations governing its administrative procedures and business. *See* section 6(4)(i) of the Pennvest Act, 35 P.S. § 751.6(4)(i). Pursuant to this grant of authority, Pennvest has adopted the regulation at 25 Pa.Code § 963.7 to govern its application process. Being fully aware of the existence of the Administrative Agency Law, the legislature refers to it *only* in section 10(c), 35 P.S. § 751.10(c), stating that it applies to an *appeal* from a Pennvest deci-

Accordingly, for this reason, we quash the Association's petition for review.[6]

### ORDER

AND NOW, this 21st day of March, 2002, the petition for review filed by the McKean Public Sewer Association challenging the decision of the Pennsylvania Infrastructure Investment Authority, dated July 18, 2001, is hereby quashed for lack of standing.

sion. As for procedures before the Pennvest Board, the legislature specifically granted Pennvest the power to develop its own. Thus, it seems that the legislature has recognized that the duties of Pennvest require special procedures unlike those set forth in the Administrative Agency Law. The Association does not argue that Pennvest failed to follow its own procedures; rather, the Association maintains that, to the extent the procedures used are distinct from those required under the Administrative Agency Law, they are insufficient to protect the interests of taxpayers when an authority seeks approval of an application for sewer project funding.

It is axiomatic that due process is flexible and calls for different procedural protections in different situations. *LaFarge Corp. v. Insurance Department*, 557 Pa. 544, 735 A.2d 74 (1999). We examine the private interest at stake, the value of the additional procedural safeguards and the government's interest in proceeding without them. *Id.* Notice and an opportunity to be heard are fundamental to due process. *Id.* There is no question that, in this case, the Association had notice of the two Board meetings and an opportunity to be heard at each one. In addition, the Association also had a separate meeting with Pennvest staff, who gave considerable recognition to the Association's complaints. Here, the Association asks for the additional procedural safeguards of the Administrative Agency Law; however, we see no value in requiring these additional procedures. The issue before Pennvest was indisputably within its expertise, and the decision was made after requesting, evaluating

and incorporating various expert reports. Moreover, the statutory provisions under which Pennvest reviews funding applications do not recognize concerned taxpayers as necessary or proper participants in applications for Pennvest funding. In other words, the concerns of taxpayers opposed to an underlying project are not within the zone of interests legally protected by the statutory scheme under which Pennvest operates. Having reviewed the procedures involved in the application process, we are satisfied that Pennvest's proceedings fulfilled the requirements of administrative due process and that the imposition of additional procedures was unnecessary.

6. Additionally, Pennvest's decision does not leave the Association without a forum in which to assert the legally cognizable interests of its members. To the extent that the Association's members had concerns with respect to DEP's approval of the underlying Project, those concerns are not properly addressed in a proceeding on Project funding before the Pennvest Board. Indeed, as Pennvest observes, adopting the position urged by the Association has the potential to turn every application for Pennvest funding into a formal adversary proceeding on taxpayer complaints about the wisdom of the underlying projects. Further, to the extent that the Association's members object to the increased rates as a result of the Project, the challenge is not properly brought before the Pennvest Board. Instead, the Association members must wait and challenge those rates once they have been established by the Authority.